IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA IN OMAHA          8:25-cv-00426

ZEHAO YU,                                      **AMENDED COMPLAINT**

      Plaintiff,                            **JURY DEMANDED**

   v.

BELLVUE NEBRASKA (a city), MICHAEL
HOLM,  THE US MINT, and GREG WEINMAN,

      Defendants.

Plaintiff Zehao Yu, hereby complains of the defendants and sets forth as follows:

1. Under color of law, Bellvue Police of Nebraska seized from Plaintiff U.S. money and authentic coins which he deposited into a Coinstar machine located at the premises of a Walmart, accused him of dropping slugs, and defrauding Coinstar, and banned him from entry to Walmart.  Defendant Bellvue racially profiled Plaintiff because his father who lives in China is a dealer of recycled metals found in Chinese dump yards and recycling factories processing waste sent from the USA to China, which the US Mint has blacklisted.  The Mint's blacklist comprises mostly of Chinese individuals.  Defendants deprived Plaintiff of his property and his means and ways to earn a living while attending university, deprived him of fair trial and procedures, racially profiled him, and caused him to stop his studies. Plaintiff was not afforded a chance to contest the seizure, and more than a reasonable time has passed with the defendants wither launching a criminal case or a forfeiture case.

2. If the underlying seized coins were prosecutreed by the Mint, then CAFRA (Civil Asset Forfeiture Reform Act of 2000) would have mandated a very strict time-table for handling retention of the coins.  For example, the federal government musrt send a notice which triggers a right to contest in 30 days, and the federal agency is bound by a 60 day limit to take actions to justify retention of the property.  The loophole in CAFRA is that the deferral agency can use a proxy, a state agency, such as the Bellvue Police, and thus be exempt from all the deadlines, notifications and requirements to take active steps, and simply take its "sweet time", and let the citizen hang with no information or remedies at

the state law. Upon information and belief, the state law in Nebraska is such the its police can just take property, call it evidence, and hold it indefinitely, with no mechanism for review, or remedies,

    3. Bellvue Defendants acted under color of state law and violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the Constitution. Plaintiff also interposes common law claims based on supplemental jurisdiction.   As against the Federal defendants the US Mint and Greg Weinman, Plaintiff asserts a Bivens claim for using the State police as its proxy to avoid duties under CAFRA.

    Jurisdiction and Venue

    4.  This Court has jurisdiction over Plaintiff's federal claim under 28 U.S.C. §§ 1331 and 1343 as an "under color of law" cause of action. The Court has supplemental jurisdiction over Plaintiff's common law claims (arrest and property seizures), which are based on state law, under 28 U.S.C. § 1367.  Bivens jurisdiction exists against the federal defendant Weinman.

    5. Plaintiff has no remedy at the State court since he filed motions to vacate the search warrant, on the ground that there was no probable cause to believe the coins were fake, and that the warrant was defectives since coins are not slugs, return the property (the coins or their value), and vacate restraining order, with the State Court at Bellevue, however the Clerk of the Court, although she accepted and docketed the motions, refused to set a hearing date, leaving Plaintiff with no remedies.

    6. Plaintiff filed his motion with the State court on Oct. 31, 2024 and was assigned Case No. MS-24-27, and was told to wait for Bailiff Colleen to call or write to him. Despite numerous phone messages (more than 10), and 4 trips to the Clerk's office, she never answered.

    7. On Jan. 28, 2025, Plaintiff then went to Court in Sarpy County, opened the door for the Hon. Judge Nathan Cox, Courtroom 6, and asked to speak with Colleen. She first denied that she is Collen, but when Plaintiff insisted, she said she will write an email with an update. Indeed, she sent an email claiming that no proof of service on the police prevented her from scheduling. Plaintiff went to the Police, served a copy, notified Colleen, and she never answered back. It appears that the State Court is declining to

2

assume jurisdiction by erecting a wall of ignorance through the attitude of the bailiff who completely ignores the Plaintiff.

8. Venue in the United States District Court for the Omaha is proper pursuant to 28 U.S.C. § 1391 as Plaintiff is a Bellevue, NE resident, the Bellevue Police operates in this district and the seizure event occurred in Bellevue, NE.

## Parties

9. Plaintiff is a citizen of China, and was a legal resident of the USA on a student visa who came to Nebraska to attain higher education. Because of the altercation with Bellvue Police he stopped his studies and moved to Spain temporarily. In order to afford cost of living as a student, Plaintiff received occasionally shipments of US coins from his father from China, and exchanged them for money at the Coinstar machines. The coins are not fake. These are coins that are collected from recycling factories that handle waste and junk sent from the USA for recycling in China. While being mechanically screened and processed the machines finds coins. At the time, Plaintiff's address was 1811 Lloyd St 2B, Bellevue, NE 68005, Tel. (531)-283-2562, Email: zehaoyu2003@outlook.com.

10.     Defendant City of Bellvue is a city of the first class in Nebraska and as such is liable for the conduct of its police force. Bellvue Police arrested Plaintiff and seized his property, without probable cause, acting as proxies of the US Mint, and in denial of his due process rights, and never responded to his motion to vacate the restraining order on accessing Walmart premises and quash the search warrant under color of law and in profiling Plaintiff's origin and race. The address is 1510 Wall Street, Bellevue, NE 68005, Tel: (402) 293-3048 or by email at ken.clary@bellevue.net.

11.     Michael Holm is a detective who asked for warrants using misleading information that he believes the coins are counterfeit, although when he was dispatched to the premises of Walmart he states the coins appeared to be legitimate, but "severely damaged". He therefore invented a story that the coins are slugs, to fit a Nebraska state sanctioning use of slugs. Holm works under Ken Clary , the Chief of Bellevue Police which is vested with powers to enforce the penal laws of Nebraska. The penal laws of Nebraska do not contain prohibitions against distribution fake American coins, as this authority is vested with the US Mint, which even has its own police. Holm is sued in

official and individual capacity. Defendant Holm acted under color of state law to deprive Plaintiff of rights and properties and harm him.

12.      Defendant US Mint mints the coins of the USA. It used to operate a redemption program for redeeming old, chipped, damaged and mutilated coins at face value, and for the convenience of consumers at shopping locations, it contracts with private operators such as Coinstar, who operates machines that pays out on the spot cash for the deposited coins. The Mint's address is 801 9th St., NW, Washington, DC 20001.

13.      The Mint acts as a commercial entity, it sells coins and numismatics and when it redeems old coins, it actually uses them as raw materials to create new coins, by melting and reusing the metals in the minting of new coins.

14.      Defendant Greg Weinman is the legal advisor devising the policies and techniques of fabricating false probable cause, avoiding testing of seized coins, and instructing the Bellvue Police how to carry out Mint objectives. Address at the Mint. Upon information and belief, he acted in tandem with John P. Brawdy, the Chief of the US Mint Police, and together they responded to Holms and Clary's request to decide who shall proceed with the investigation, Bellvue or the Mint. Note that Bellvue does not have a lab for testing US coins, and does not normally prosecute counterfeit coins offenses. These are within the Mint's powers and experise. Weinman and Brawdy directed Holms and Clary to proceed as a prosecution of usage of "slug", instead of the real offense which belongs in the Mint's police, counterfeits not originatinf from the Mint.

15.      Freg Weinman is known to have declared a war on the re-importation of US coins found in the Chinese recycling factories. He has developed blacklists and monitoring of imports from China, has employed quack experts to falsely fabricate lab reports of metallurgical composition, (claiming they can identify faked using 3D inspection), and has hired quack experts to give fake opinions based on mere "feel and see" inspections of the imported coins. His war on the import of recycled coins led him to develop repugnant tactics, practices and protocols of operations, intended to crush the importer first seizing the property and any case and deposits in the banks, intended to suffocate and crush the subject, and then drag out the time sending samples to testing.

4

First, he takes all the property, without any evidence that the coins are forged, and then he fights the victims in Court by vexatious and evasive litigation.

16.      Upon information and belief both defendants acted in concert (Bellvue being proxy of the Mint), as the Mint holds the black list of Chinese exporters of used and damaged coins, and actually launched patently false arrests and false seizure of shipments from China to deter them from redeeming the coins and to stop such importation. It also owns a laboratory were tests for the authenticity of coins are performed, and it pays private self-proclaimed experts at points of entry to false declare that shipments from China contain forgeries. Since Bellvue Police is not equipped nor is it capable of testing coins, it is clear that profiling of redeemers of the coins, is done in cooperation between the agencies in concert.

Facts

17. On Oct. 7, 2024, Plaintiff went to a Walmart supermarket located at 10504 S. 15th St. Bellevue, NE 68123, and started using the Coinstar machine by dropping coins. An employee called the police, and the officer gave Plaintiff a restraining order dated Oct. 7, 2024 (Ban and Bar Letter) signed by Officer Badge 407, forbidding Plaintiff from returning to the premises of the Walmart Supermarket where there is a Coinstar machine (kiosk) for redeeming US coins into money, for a period of one year until Oct. 7, 2025.

18. On Oct. 11, 2024, Plaintiff Holms petitioned the Nebraska District Court in Bellevue for a search warrant. To do so he needed some probable cause to allege that the coins are forged or that there was some sort of criminal activity, however, there was none. Note, that even a year later (Nov. 17, 2025) no criminal indictment was filed for any alleged criminal activity. This is why detective Holms invented the "dropping slugs" allegation, even tough no coin whatsoever even remotely looked like a slug. The warrant was executed on Oct. 18, 2024. Holms actually said that the coins looked real, but were damaged. If the coins looked real, then they could not have been slugs.

19. On Oct. 7, 2024 the Bellevue Police took from Plaintiff's hands $1,600 by the responding officer (without a warrant and without giving a receipt),and on Oct.18, 2024 when the search warrant was executed, the Police took property as listed in the inventory (12 items), including but not limited to about $6,000 in banknotes and $44,000 in coins,

5

and on that same day, Friday Oct. 18, 2024 the amount of $59,439 was taken from a safe deposit box at the InterState Bank using a key that was found in Plaintiff's apartment. Plaintiff was arrested on that day.

20. On or about Oct. 30, 2024, Plaintiff petitioned the Nebraska District Court (a) to quash the search warrant and declare it null and void, and as result return all seized property to me, and (b) to vacate the restraining order barring me from the Walmart premises.

21. Plaintiff explained in his affidavit that the: "warrants were defective and overly broad, and even unconstitutional, in that the officers who asked for the warrant said upon asking for issuance of the warrant that they have a probable cause to suspect that I was dropping SLUGS into the Coinstar machine at Walmart, when in fact they had no probable cause to suspect that I was dropping slugs, and indeed upon execution of the warrant they found no slugs whatsoever".

22. Plaintiff affirmed in his affidavit further that "Moreover, while the officers stated that the suspicion related to slugs, the property allowed to be seized pursuant to the warrant was "currency (money in US coins or US bills), and not slugs. That creates a major disparity between the stated probable cause (slugs) and the kind of property requested to be seized (currency). That makes the warrants defective, and overbroad. The coins are not slugs. Slugs are not US coins. Slugs are pieces of cheap metal, usually with no embossing on the coin, i.e. a blank face, just a flat piece of metal, usually aluminum that is dropped into a machine to pass off as a real coin, whereas a real coin is a coin that was originally minted at the US Mint, but it can be in good condition, or damaged due to heavy use, or worn out".

23. Plaintiff affirmed in his affidavit further that: "To the best of my knowledge, real US coins always contain at least two different metals (nickel and copper). Slugs are defined in Neb. Rev. Stat. §§ 28-607 (2)(a) as: "Slug shall mean an object which by size, shape, or any other quality is capable of being inserted, deposited, or otherwise used in a coin machine as an improper but effective substitute for a genuine coin, bill, or token". The words "substitute for a genuine coin" show that "genuine coins" are not slugs. Genuine coins can come in many forms: brand new, used, worn, damaged, washed, mutilated, dented and "uncurrent". "Uncurrent Coins" are defined in the Fed US Mint

web site as: "Uncurrent coins are whole U.S. coins that are worn yet recognizable as to genuineness and denomination, and are machine countable. Uncurrent coins are redeemed by the Federal Reserve Banks, then forwarded to the Mint for disposition".

24. Plaintiff affirmed in his affidavit further that: "The Mint's web site also states that "Uncurrent or mutilated coins redeemed by the Mint are melted and reused in the manufacture of coinage strips"[1].   It is my belief that the agent who asked for the warrant had confused the Honorable Court with the terms.  While the warrant cites the offense of using slugs, there is nowhere in the language permitting seizure of my property the word "slugs" and instead the word used is "currency".

25. Plaintiff affirmed in his affidavit further that: "Currency" obviously includes coins and money bills, even though the Walmart complainant never complained about money bills.  They complained that coins jam the Coinstar machine.  So, in essence the permission to seize property, including currency, is not consonant with the allegations that slugs were being used, and is not consonant with the offense cited (use of slugs), thereby creating a critical and material defect and misleading information in bad faith. Due to high sophistication of Coinstar machine impossibility of Pay- out for slugs

26. Plaintiff affirmed in his affidavit further that: "To the best of my knowledge, in today's technology, the sorting machines such as Coinstar are so sophisticated that they can easily catch slugs and reject their validation.  The machines today, especially those of Coinstar are so sophisticated that they can easily tell if the weight of the coin is within US Mint parameters, and the same goes for sensing the metallurgical composition of the metals.  In fact, Coinstar's publication on the internet brags about its machines' sophistication and promises its retailers unlimited tech support (for example in case of a jammed coin)".

27. Plaintiff affirmed in his affidavit further that: "In my case, I have used the Coinstar machine at Walmart but I only dropped real US coins in the machine, not slugs. Had I put slugs in the machine, the machine would have "caught" a slug a long time ago and refused to pay out its value, a long time ago".

---

[1] Consumer Information | U.S. Mint at https://www.usmint.gov/news/consumer-alerts/consumer

28. Plaintiff in his affidavit also addressed the "Lack of Intent" as follows: "Section 28-607 requires that the act be "with intent to deprive a supplier of property or service sold or offered. I deny any intent to deprive Coinstar of any services, property or value. For one, my coins were and are genuine, and second, I relied on the accuracy of the machine's readability and detection capabilities. I am 21 years old and I am an overseas student from China. My father in China is a dealer who works with Chinese metal recycling factories who receive containers of junk from the USA (and many other countries) for recycling. During the process, old and used coins are found, and they are sorted and separated, and sold to dealers to bring them back to the United States and redeem them for cash. My father has been sending to me such coins so that by redeeming them for cash, I can support myself while I am a student, and that's the only purpose".

29. Plaintiff affirmed in his affidavit further that in order not to deprive the resident of his Due Process rights, the government authorities should first test sample coins, and only after having conclusive evidence of forgery or criminality, resort to search warrants and asset seizures. In that respect, Bellue Police is ill equipped to handle such an investigation, and such investigation more properly belongs to a Federal Mint investigation. The US Mint has expertise in these matters, and has its own Mint police, and has its own laboratories, and has conducted several prosecutions against Chinese importers or uncurrent coins.

30. However, so far, the Mint failed in all of the litigations they launched, except one case where the importer was trapped in Israel due to a no exit order that his ex-wife placed on him, and missed deadlines.

31. In the major cases that are reported ("Healthy Max", "One Black Porche") the Mint admitted to filing a false lab report, that it melted the coins for reuse, and it ended up paying in full. In these cases, the Mint's expert said that there was residue of aluminum on the outer surface of the coins. However, this was easily refuted by a counter expert who explained that any contact with a cash register of a money counting machine will surely leave races of aluminum on the surface.

## FIST CAUSE OF ACTION – COLOR OF LAW 42 U.S.C. § 1983

32. Plaintiff incorporates the preceding paragraphs by reference.

8

33. Defendants Holms and Bellevue, at all times relevant to this action were acting under color of state law. Although they are empowered to investigate fraud and use of slugs, the case at hand was actually a US Mint investigation of import of forged coins from China, which Bellvue has no authority to investigate, not does it have the facilities and equipment to test coins before making radical claims that there is a general suspicion of counterfeit. This general suspicion of counterfeit, without independent "homework" or verification was made prior to requesting a warrant solely because Plaintiff is Chinese. If Plaintiff was a snow white Nebraskan dropping coins at Walmart, it is most likely that Holms, his boss Clary and the entire BPD would have been more careful, and more prudent in ascertaining basic facts before invading someone's home, car, safe deposit box and arresting him, all when not even one coin was tested.

34. Defendants Holmes and the Bellevue City and police unlawfully deprived Plaintiff of his property without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States. As stated, they made an unreasonable and warrantless seizure of Plaintiff's personal property (coins, monies at home and even monies in a safe deposit in the bank) in violation of the Fourth Amendment to the Constitution of the United States as incorporated and applied to the states by way of the Fourteenth Amendment to the Constitution of the United States. They did not give Plaintiff an opportunity to contest, they ignored the motions he filed at NEB. State court (where the warrants were signed), and while performing police work that belongs to the US Mint, they saw themselves exempt from the unified guidelines and deadlines in CAFRA, as if they are allowed to hold the proceeds in perpetuity, without accountability. Note that at the time of this Amended complaint, 13 months passed with not even one letter or notification, whether BPD intends to use the coins in evidence, or intends to launch a criminal proceeding, or intends to destroy the coins, or anything else.

35. At all times relevant hereto, Defendants Holms and the Bellevue City and police acted in the same model of operations that the US Mint has demonstrated in the past 10 years, i.e. ignoring CAFRA duties, fabricating allegations of forgery and/or criminality without probable cause (other than the association of a Chines name, automatically, to a fantom network of Chines forgerers of coins, raid the house, lien on the bank, taking all

the money, and then refusing to answer any questions dragging the time, and letting the subject bleed in frustration,

36. Defendants Holms and the Bellevue failed to adopt proper and clear policies for the handling of slug offenses, ways of professionally identifying slugs, (as opposed to old and mutilated coins), and failed to properly train its deputies as to the proper handling of offenses involving slugs and Coinstar abuse of its machines. In fact, the use of the fictitious suspicion of "dropping slugs" was a ruse to fit the alleged offense to a Nebraska penal code, while it was really a Mint investigation in disguise, using the Nebraska police as a front or proxy.

37. Defendants Holms and Bellevue failed to adopt a clear policy or custom, that will provide the subject with an opportunity to contest the seizure of the properties, such as scheduling a court hearing within 7 days to confirm an interim seizure pending the completion of the investigation. Here Plaintiffs simply took the properties, (some without receipts), and "disappeared. A proper procedure would have been a follow up hearing on notice within 7 days to confirm the retention of the inventory taken pursuant to the search warrant, to allow Plaintiff to allege defects in the search warrant itself, and to give the Plaintiff his day in Court to contest the dubious allegations of "probable cause". This was required, especially, when draconian measures were used, such as seizure of property to directly connected to the incident at Walmart (the money at home and in the bank), measures that live the Plaintiff suddenly impoverished without means of subsistence, no money for food, and no money to pay rent.

38. Defendants Holms and Bellvue knowingly, willingly and purposefully lied to a Nebraska state judge in order to issue a warrant that they have reasons to believe the coins are counterfeit, and/or that there was intent to defraud Walmart or Coinstar, since Holmes himself wrote (or saw from note of responding officer) that the coins look original, although damaged.

39. The conduct of defendants Holms and Bellvue was a direct and proximate cause of the constitutional deprivation suffered by Plaintiff.

40. Plaintiff is therefore entitled to a return or compensation (depending on what Defendants did with the seized coins or monies, but preferably compensation):

(a) compensation for the of $1,600 seized by the Responding officer on Oct., 7, 2024. On the day Walmart Manger called the police, the policeman had no warrant, and also had no probable cause. This money was not deposited into the machine, so there was no use of slugs, no use of counterfeit coins, and no fraud or theft committed on Walmart.

(b) Compensation for the Items listed on the Inventory in execution of search warrant Oct, 18, 2024. No slugs were found or seized. The purported offense listed on the warrant was use of slugs in the form of coins. There was no justifiable reason to seize currency in the form of money bills, or anything else other than slugs which do not exist. There was no probable cause whatsoever for asking for a warrant to seize money bills.

(c) As for the coins, the Bellue Police had from Oct. 7, 2024 to Oct. 18, 2024 enough time to obtain a certified lab report of coins that were actually dropped into the Coinstar machine on October 7, 2024 and were found to be counterfeit. In the absence of such a report, there was no probable cause.

(d) compensation for the money taken from the bank safe deposit on Oct. 18, 2024. When executing the search warrant at the home, the police found a key to a safe deposit First Interstate Bank, Lock Box 195. They proceeded to the bank, opened the safe deposit and took $59,439 in money, and filled out an inventory form at 16:25 (Officer Melvin). Plaintiff was not advised of existence any search warrant for the safe, and it appears that the safe was outside the scope of the Oct. 11, 2024. Plaintiff cannot fathom what probable cause exists for the seizure of money in the bank, that is intended for his living expenses as an overseas student. There appears to be no nexus between the money in the safe and the alleged offenses or crimes that were communicated to Court on Oct. 11, 2024.

The search warrant was requested to find evidence of concealing Coinstar transactions with emphasis on "counterfeit currency". However, the only currency hat Coinstar accepts is coins. The designated address for the search does not include

11

the InterState Bank.  Therefore, there was no authority to go to the InterState Bank and seize the money bills in there.

The search warrant did not include authority to seize monies alleged to be fruits of a crime for purposes of forfeiture of crime benefits.  It only allowed seizure of evidence concealing Coinstar transactions with counterfeit currency.  Therefore, no money bills should have been seized.

Moreover, before asking the court for a warrant the officers should have had solid proof that the coins are counterfeit, and in most likelihood, they had none.

It appears they wanted to seize coins so that they can send them to the Mint for testing and generate an after the fact retroactive justification for a probable cause that never existed.

(e) compensation for pain and suffering resulting from the false arrest and illegal seizure of the property which ultimately resulted in loss of employability prospects as Plaintiff was forced to drop out of the college, and also had to leave the US in the middle of a school year he paid for full tuition, because all his survival money was seized. in the amount of $200,000.

## 2nd CAUSE OF ACTION - CONVERSION

41.  Plaintiff hereby incorporates the preceding allegations as if fully rewritten herein.
32. Without Plaintiff's consent, Defendants intentionally deprived Plaintiff of his rightful possession of his property and means of livelihood, resulting in dropping out of college, including the coins taken at Walmart, the money seized pursuant to the search warrant, and then emptying the contents of Plaintiff's safe in the InterState Bank.

42. At all times relevant hereto, these Defendants acted with malice, recklessness and total and deliberate disregard for the contractual and personal rights of Plaintiff.

43. In addition to the underlying desire of the Mint and Greg Weinman to stop the importation of coins from recyclage in China, by inflicting costs, attorney costs, litigation

costs, having monies tied up allegedly as evidence with a definitive time periods and potentially in perpetuity, and exceeding scope of warrants by going after any liquid assets that can suffocate Plaintiff, and people like him, economically, they were also motivated by deterrence, hoping that what they are doing to a small student in Nebraska, will pass by word of mouth to all those who may think of redeeming coins via Coinstar machines.

44. Surely, if the seized coins were "required as evidence in a trial" then after 13 months one would expect that some trial would have started to justify the retention "as evidence".  However, there is no trial, there is no demonstrated intend to start any trial, and even the motion Plaintiff filed in State court (which was served in person at BPD) was ignored, and they filed no response.  This gives the impression that the State court is protecting the BPD from embarrassment (by refusing to schedule a hearing date).

45. Plaintiff is entitled to an award of damages for the violation of the 4th Amendment rights (see Bradley v/ Lincoln Police) 4:20CV3134 (2021) in the amounts as in count 1.


### 3rd CAUSE OF ACTION – FALSE ARREST

46. Plaintiff hereby incorporates the preceding allegations as if fully rewritten herein.

47. Plaintiff was falsely arrested in Oct. 18, 2024, and falsely incriminated in criminal activities (such as forgeries, use of slugs and fraud on Walmart, and his properties were illegally seized from him based on a search warrant obtained upon falsehoods, and utter lack of probable cause.

48. It is impossible that the Nebraska police officers could have formed a probable cause that the coins that Plaintiff deposited were slugs.  Any visual inspection of the coins must have resulted in an unequivocal impression that they are real coins, they weigh and feel as real coins, the embossing is the same as real coins, and if I paid a cashier with these coins, he would never reject them, because they look and feel like real US coins.

49. So, in order to know, before seizing the coins that they are slugs, the detectives must submit sample coins to a federal Mint laboratory, or some other testing laboratory, to check the metallurgical composition.  Plaintiff believes that none of this was done.

50. Theoretically, between the complaint date (10/7/2024) and the date of the request for a warrant (10/11/2024), the officers could have asked the Walmart complaining

personnel for a batch of some sample coins that Plaintiff actually deposited, and had them tested at an authorized Laboratory, but surely that did not happen.

51. From Plaintiff's interaction with the Walmart personnel, they did not say anything about slugs.

52. Before 10/7/2024, a Walmart employee came to Plaintiff and complained that a coin jammed the machine. A jam of the machine can occur when a random coin is bent. On 10/7/2024 the Manager who came out claimed that customers inside the supermarket received the coins and complained.

53. Therefore, Plaintiff believes that the coins were not tested before asking for the warrant in order to supply a probable cause that there are slugs (or for forged coins).

54. Also, Probable Cause was lacking as to the allegations of "Theft by Deception". The only other offense cited in the search warrant is Theft by Deception. Once again there can be no probable cause for such an assertion.

55. Coinstar itself has a contract with the retailers such as Walmart, and another contract with the US Mint. Coinstar is a sort of agent for the US Mint for collecting old coins, so that the Mint can reuse them as raw materials, after melting them, for minting new coins. Walmart is obligated to turn the coins over the Coinstar, who in turn sends them to the Mint.

56. On October 7, when Plaintiff had a confrontation with the Walmart employee who later called the police (the "Manager"), he told Plaintiff that Walmart had incurred a loss because the coins Plaintiff deposited were handled by Walmart and given to customers, who then complained.

57. Such a situation should never have occurred. No Walmart customer is supposed to receive coins deposited at the Coinstar machine. They are supposed to be sent to the Mint. In fact, on the internet website of Coinstar, they promise the retailers 100% reimbursement for any problem whatsoever.

58. Thus, it is nearly impossible to defraud the Coinstar machines or connive the machine. These machines are fool-proof, and as such, they are presented to the public.

59. If that manager at Walmart said the truth, (i.e. he did not invent an excuse), that Walmart is really giving the coins to ordinary customers at the supermarket, then that's fraud between the Walmart branch and the Mint. They are not supposed to do so.

14

60. Therefore, Walmart could not have suffered any losses, because they do not handle these coins themselves. The coins are processed by Coinstar, and Walmart doesn't even have the right to access these coins.

61. According to Coinstar on the internet "Our entire fleet of kiosks are owned, maintained and serviced by Coinstar, which means there is no financial or reputational risk for your business… and benefits such as "Hassle-free, turnkey coin pickup and processing service, Protection from loss by eliminating short coin rolls, The highest degree of voucher security in the industry, Exceptional uptime and unlimited free technical support".

62. That means the kiosk belongs to Coinstar and not to Walmart, so only Coinstar can complain, not Walmart.

63. Moreover, if the coins do not look like slugs, a reasonable officer could not have formed a fair probability that contraband or evidence of a crime will be found at the searched premises based on the offense of "theft by deception".

64. Plaintiff suffered the horrors of a false arrest, his constitutional and procedural rights were deprived, and did not even receive a day in court to contest the seizures of property, and therefore Plaintiff is entitled to an adequate pecuniary compensation proportionate with the figures listed in count 1.


### 4th CAUSE OF ACTION – ILLEGAL SEZURE OF PROPERTY


65.   There was no probable cause that Plaintiff dropped slugs or counterfeit coins.

66. The Walmart personnel made 2 conflicting versions: that on a prior occasion a coin jammed the machine, and that the coins ended up being given to Walmart customers as change. None of this supports probable cause, because also an authentic coin can damage the machine, and no coin should be given to Walmart customers.

67. Plaintiff called the Police on Oct. 29, 2024 and was told that the seized coins are being transferred to the Mint, and it "will take time". From Plaintiff's father's experience, Mint testing can take a year or more.

15

68. However, here in collaboration with the Mint and Greg Weinman, they decided with BPD to keep the coins and dollar bills as if BPD is conducting an investigation, and thus artificially exempt both of them from the CAFRA rules. As for the coins, they are not an ordinarily type of "evidence", because to qualify as evidence they must be tested. If the test reveals that they are genuine, then there will be no trial and they are evidence of nothing criminal. In such circumstance, Plaintiff should have received the right to attend, himself, or via counsel or expert of his own, the test at the lab, and at minimum receive a sample in sufficient amount pursuant to professional standards so that he can have the sample tested, and prove his innocence. As for the dollar bills, they do not qualify as "evidence", because there is nothing that connects them to Coinstar machines or alleged intend to defraud Walmart, or the Mint. The dollar bills should not have been seized to begin with, and even, arguendo, some criminal case was launched, their presentation at trial is useless in evidence to anything, unless Plaintiff himself raises issues of falsification or tampering. Meanwhile, as said, 13 months from the seizure is more than a reasonable time for the defendants to decide whether to proceed with a trial of some sort, or decline to prosecute.

69. Upon information and belief when Coinstar itself sends coins collected from customers to the Mint, the coins are run through "gate entry" machines, that take no more than a week to process and reach a finding whether they are fake, or not.

70. Plaintiff suffered illegal seizure of his property, his constitutional and procedural rights were deprived, and did not even receive a day in court to contest the seizures of property, and therefore Plaintiff is entitled to an adequate pecuniary compensation proportionate with the figures listed in count 1.


## 5th CAUSE OF ACTION– BIVENS

71. As to the Mint Defendants, Plaintiff was informed by his father that the US Mint has targeted importers of coins salvaged from the recycling factories in China, and have been complaining that the coins coming from China are forged, without basis.

72. Already in 2010, in response to the Mint's complaints, the Office of the Inspector General conducted an investigation, ambushed several random trucks with coins en route

16

directly to the US Mint. Samples were tested and no forgeries were discovered at all (other than a miniscule number of false coins equal to that prevalent in the general commercial stream of commerce. The OIG in 2010 also sent agents to China to track indications for manufacturing of forged coins, and it found nothing.

73. From 2010 to 2024 not a single factory in China has been identified by the Mint as manufacturing fake US nickels, dimes and quarters. The obvious reason is that it is simply not economical to engage a whole line of production just for nickels, dimes and quarters.

74. On the other hand, the recycling factories and dump yards of junk (shipped from the US to China) are open and transparent, their addresses are known, they are regulated by the strict Chinese government, and none of them has been found to be engaging in the manufacture of fake US coins, as the OIG himself found in 2010.

75. In 2 case that were litigated in federal court, launched by federal District attorneys guided by the Mint police personnel, the DA's and the Mint claimed that some aluminum residue was found on the coins, but at court they conceded that it was only on the surface, and that it is normal result of the coins coming into contact with metal in cash register.

76. In 2015 US agents filed a case in NJ (which was later transferred to Philadelphia) seeking civil forfeiture of similar coins valued between $5.5-$6 million. See US v. One 2014 Black Porsche, Index No. 2:15-cv-05814-JS.

77. The US claimed the same arguments in that case, that the coins were forged, that they did not originate from the US Mint, and that "all of the coins appeared to be corroded (having a greenish-brown patina) and mechanically deformed and/or chipped" (Compl. ¶36). They also argued that "clad coins can be reversed engineered" (Compl. ¶38), and that the "level of detail needed to make them appear genuine would be much lower" (Compl. ¶39). In ¶46 of the Complaint it was alleged that CBP laboratory analysis found "aluminum and silicon which are not found in genuine US coins".

78. However, other than speculations about a possibility of reverse engineering and the same color of corrosion, the US Gov't did not provide any evidence that the coins were indeed not genuinely originated from the US Mint.

79. The defendants submitted an expert report of Mr. Richard Baron who is an expert in forensic engineering and chemical compositional testing who negated all the

speculations of the US Gov't (Docket #30). Mr. Baron explained that "the detection of aluminum and silicon during chemical analysis is not uncommon, since such elements are very abundant in nature. The detection of such elements in metallic objects that have been mutilated would even be expected, either through the transfer of these elements from contact against other materials during the scrapping (or recycling) process or from exposure to the environment (e.g., soil)".

80. Also, Mr. Baron explained that the "analytical techniques employed" were not disclosed, and there was no information whether the sampled coins from the block of samples originally sent to the lab, actually represented the entire block, or cherrypicked items.

81. As to the allegation that the coins exhibited a "greenish-brown patina", the expert explained that this is exactly what is expected from old coins composed of

82. 75 percent copper and 25 percent nickel: "the described patina exhibited by the coins is typical for copper rich materials and is not necessarily an indication that the subject coins were intentionally exposed to chemicals in order to mask their true appearance".

83. A hearing was conducted before the Hon. Judge Juan Sanchez in the Eastern District of Pennsylvania on July 14, 2015 and a week later on July 21, 2015 the Government notified it was withdrawing its complaint and the entire case was dismissed with prejudice.

84. In a related case where the defendant Wealthy Max was suing the Government for the unpaid shipments, Wealthy Max Limited v. US Treasury, 2:15-cv-05875-WB before the Hon. Judge Wendy Bettelestone, for additional shipments worth $3.25 Million for coins that were detained in the Ports of Los Angeles and New York.

85. These coins that arrives in L.A. were actually tested by the Government (CBP) and the Report dated Jan. 21, 2015 concluded that "The samples have a broad range of date, mint marks, and their weights and alloy compositions are indistinguishable from standard currency". The coins that arrived in NYC were Dollar coins and they were also tested on February 10, 2015, and the same language was written in that report.

86. Nevertheless, all demands to remit back the detained coins were unanswered by the CBP.

87. One year and 4 months after the filing of the complaint, the attorneys for Wealthy Max notified the court on March 1, 2017 that the US Government paid fully for 2 shipments and was going to pay for the 3rd in 30 days in full.

88. So, the Mint ended up paying full value for the coins, after admitting that they actually used the seized coins to melt them and reuse them to create new coins.

89. In fact, the US Mint has a program for redemption of "mutilated coins" or "uncurrent coins", and in fact the Mint has machines that sort and read all the coins they receive before making a payout.

90. Given this background, it appears the Mint and its personnel defendant, Mr. Weinman, maliciously developed draconian handling procedures of suspected imported coins from China, taking actions knowingly and willingly with intent to harm persons such as Plaintiff, by ruining them, impoverishing them, taking away their survival and subsistence means, and simply not responding to any demand and refusing to show proof that indeed the coins they claim are forged, are indeed coins.

91. Upon information and belief, Defendant Weinman has directed all agencies working with the Mint on the import of coins (customs, homeland security, secret service) to ignore CAFRA rules, delay testing, invent new "3D" testing methods that are not universally recognized in the scientific community. In fact, Mr. Weinman also instructed and authorized its lab personnel to publish articles about the new 3D tests, as if they are universally accepted, and then plant those citations in the lab reports of the Mint.

92. Upon information and belief, within 14 days from the altercation at Walmart Chief of BPD Mr. Clary called Weinman to consult with him whether to proceed as a slug case in State court or as a counterfeit case with the Mint Police, under the federal law, the Weinman instructed him to obtain a warrant in a state court, and fabricate the suspicion of "use of slugs". This way the agency for which Mr. Weinman consults, the Mint, enjoys both worlds: the BPD is acting as his proxy, and at all times he retains to privilege of pulling the case out of the State police and into a federal realm, yet enjoying the bypass of the CARFA rules to the maximum.

93. Plaintiff heard from his father that he knows of Mr. Weinman's manipulations already from 10 years ago, and that there is no coin importation transaction from China that he does not handle personally.

19

94. The conduct of the Mint and Weinman caused Plaintiff the damage described above and therefore Plaintiff was harmed directly by the Mint, Weinman in his official capacity (assumed by the Mint) and Weinman in his personal capacity for instructing BPD to go ahead with a Nebraska warrant cased on bogus claims.

95. Plaintiff is entitled to damages in the amount of $350,000.

WHEREFORE, Plaintiff prays for a judgment awarding him $350,000 and/or compensatory damages in an amount to be determined at trial, plus reasonable attorney fees pursuant to 42 U.S.C. § 1988, and the costs and disbursements and any other just and proper relief.

Dated:  Barcelona, Spain
        Nov 19, 2025


_____

Zehao Yu, Plaintiff
100 Carrer de Mallorca St.
Barcelona 08029 Spain
Tel. (531)-283-2562
Email: zehaoyu2003@outlook.com

City of Bellvue Nebraska
c/o Bellvue Police
1510 Wall St, Bellevue, NE 68005
Tel. (402)-293-3100

Michael Holm
A detective at Bellevue Police
1510 Wall St, Bellevue, NE 68005
Tel. (402)-293-3100

US Mint
801 9th St., NW, Washington, DC 20001.
Tel. (202)-898-6468.

Greg Weinman
Chief counsel of US Mint
At The US Mint
801 9th St., NW, Washington, DC 20001.
Tel. (202)-898-6468